**AMENDED AND RESTATED OPERATING AGREEMENT**
**OF**
**BELLEFONTE PROPERTIES, LLC**
**A KENTUCKY LIMITED LIABILITY COMPANY**
**(Member Governed)**

This Amended and Restated Operating Agreement (this "Agreement") is made and entered into effective as of the 27th of January, 2026. The parties hereto as the Members of the Company enter into this Revised Operating Agreement for all purposes permitted to an operating agreement under Kentucky law.

RECITALS

WHEREAS, on February 8, 2022 the Company's members formed a limited liability company pursuant to and in accordance with the Kentucky Limited Liability Company Act, outlined in Chapter 275 of the Kentucky Revised Statutes, as the same may be amended from time to time (the ″Act″);

WHEREAS, the prior members entered into that certain Operating Agreement dated February 8, 2022 (the "Prior Agreement"); and

WHEREAS, in connection with the sale of the Company membership interests by Shelton Robinson Properties LLC to Emend Health Corporation, the Current Members desire to enter into this Agreement to amend, restate and supersede the Prior Agreement and all other Company operating agreements and to adopt this Agreement as the operating agreement of the Company to establish its rights and responsibilities and to govern their relationship, and hereby agrees as follows:

## ARTICLE 1
## INTRODUCTION

**Section 1.1 Definitions**

Whenever used in this Operating Agreement, the following terms shall have the following meanings:

a) "Act" shall mean the Kentucky Limited Liability Company Act, KRS Chapter 275, *et seq*.

b) "Affiliate" shall mean any individual, partnership, corporation, limited liability company, trust, or other Entity or association, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with a Member. The term control as used in the immediately preceding sentence, means the possession, direct or indirect, of the power to direct or cause the direction of the management policies of an entity or individual, whether through the ownership of voting securities, by contract, or otherwise.

c) "Agreement" or "Operating Agreement" shall mean this written Amended and Restated Operating Agreement, as originally executed and as amended from time to time, and the terms "hereof", "hereto", "hereby", and "hereunder", when used with reference to this Operating Agreement, refer to this Operating Agreement as a whole, unless the context

otherwise requires. No other document or oral agreement among the Members shall be treated as part of or superseding this Operating Agreement unless it is reduced to writing and has been signed by all the Members.

d) “Bankruptcy” shall mean with respect to any Person, Voluntary Bankruptcy, or an Involuntary Bankruptcy. “Voluntary Bankruptcy” means, with respect to any Person, the inability of such Person generally to pay its debts generally or a general assignment by such Person for the benefit of creditors, the filing of any petition or answer by such Person seeking to adjudicate it bankrupt or insolvent, or seeking for itself any liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of such Person or its debts under any law relating to bankruptcy, insolvency, or reorganization or relief of debtors, or seeking, consenting to, or acquiescing in the entry of an order for relief or the appointment of a receiver, trustee, custodian, or other similar official for such Person or for any substantial part of its property; or corporation action taken by such Person to authorize any of the actions set forth above. An “Involuntary Bankruptcy” means, with respect to a Person, without the consent or acquiescence of such Person, the entering of an order for relief or approving a petition for relief or reorganization or any other petition seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or other similar relief under any present or future bankruptcy, insolvency, or similar statute, law or regulation, or the filing of any such petition against such Person which petition shall not be dismissed within ninety (90) days, or, without the consent or acquiescence of such Person, the entering of an order appointing a trustee, custodian receiver or liquidator of such Person or of all or any substantial part of the property of such Person which order shall not be dismissed within sixty (60) days.

e) “Capital Account” shall mean the account established and maintained for each Member in accordance with this Operating Agreement and applicable Treasury Regulations.

f) “Capital Contribution” shall mean the total value of cash and agreed fair market value of property contributed and agreed to be contributed to the Company by each Member. Any reference in this Operating Agreement to the Capital Contribution of a then Member shall include a Capital Contribution previously made by any prior Member for the interest of such then Member, reduced by any distribution to such Member in return of "Capital Contribution" as contemplated herein. Additional contributions may only be made by a Member with the consent of all other Members.

g) “Code” shall mean the Internal Revenue Code of 1986, as amended, and any revisions or regulations passed thereunder. All references herein to sections of the Code shall include any corresponding provision or provisions of succeeding law.

h) “Company” shall refer to this Bellefonte Properties, LLC**.**

i) “Current Members” shall refer to all members in place at the time of execution of this Operating Agreement: Emend Health Corporation and Walker Land Company VI, LLC.

j) “Entity” shall mean any association, corporation, estate, general partnership, limited partnership, limited liability company, joint stock association, joint venture, firm trust, business trust, cooperative, and foreign associations of like structure.

k) “Fiscal Year” means the Company's Fiscal Year, which shall be the calendar year.

l) "Interest" in the Company shall mean the entire ownership interest of a Member in the Company (at any particular time), including the right of such Member to any and all benefits to which a Member may be entitled as provided in the Operating Agreement and under the Act, together with the obligations of such Member to comply with all of the terms and provisions of the Operating Agreement.

m) "Majority Interest" shall mean greater than fifty percent (50%) of the combined percentage Interests in the Company.

n) "Member" shall mean each of the parties to this Operating Agreement and each of the parties who hereafter become additional or substituted Members.

o) "Organization Expenses" shall mean those expenses incurred in connection with the formation of the Company.

p) "Percentage Interests" of a Member shall mean the percentage interests in the capital, profits, and losses of this Company of such Member.

q) "Person" shall mean any individual and any legal entity, and their respective heirs, executors, administrators, legal representatives, successors, and assigns.

r) "Principal Office" shall mean the office referred to and located as follows: 125 South Main Cross Street Louisa, KY 41230.

s) "Property" means that certain 10.9-acre parcel of real estate located at 1000 St. Christopher Drive, Russell, Greenup County, Kentucky 41101

t) "Pro Rata Part" means the proportion that a Percentage Interest of a Member bears to the aggregate Interest in the Company of all members.

u) "Substitute Member" shall mean any person or Entity who or which is admitted into Membership upon the written consent of all Members pursuant to Section 6.4 of this Operating Agreement.

**Section 1.2 Operating Agreement**

For and in consideration of the mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Members executing this Operating Agreement hereby agree to the terms and conditions of the Operating Agreement, as it may from time to time be amended according to its terms.

**Section 1.3 Formation**

Pursuant to the Act the prior members formed a Kentucky Limited Liability Company with the Secretary of State of Kentucky. The parties are authorized to, and shall immediately, and from time-to-time hereafter, as may be required by law, execute all amendments to the Articles of Organization, and do all filing, recording, and other acts as may be appropriate to comply with the operation of the Company under the Act. In the event of a direct conflict between the provisions of this Operating Agreement and the mandatory provisions of the Kentucky Limited Liability Company Act or the

provisions of the Articles of the Company, such provisions of the Kentucky Limited Liability Company Act or the Articles of the Company, as the case may be, shall control.

**Section 1.4 Intent**

It is the intent of the Members that the Company shall always be operated in a manner consistent with its treatment as a "limited liability company" for federal and state income tax purposes. It is the further intent of the Members that the Company not be operated or treated as a "partnership" for purposes of Section 303 of the federal Bankruptcy Code. No Member shall take any action inconsistent with the express intent of the parties to the Operating Agreement.

**Section 1.5 Name**

The name of this company shall be: Bellefonte Properties, LLC and all business of the Company shall be conducted under that name or under any other name, but in any case, only to the extent permitted by applicable law.

**Section 1.6 Place of Business**

The principal place of business of the Company shall be: 125 S Main Cross Street Louisa, Kentucky.

**Section 1.7 Purpose and Nature of Business**

The object and purpose of the Company and the general nature of the business it proposes to transact shall include all transactions of any or all lawful business for which limited liability companies may be formed under the laws of the Commonwealth of Kentucky, including, without limitation, the ownership of the Property, of which the Company is the sole owner. The character of the business which the Company initially intends to conduct is the provision of real estate development.

**Section 1.8 Term**

This Company shall commence upon the filing of its Articles of Organization and shall continue until such time as it shall be terminated under the provisions hereunder.

**Section 1.9 Members of Company**

The name and address of each of the Members of this Company shall be kept in the Company records with the Articles of Organization and this Operating Agreement.

**Section 1.10 Agent for Service of Process**

The name and business address of the agent for service of process for the Company is Jessica Burke 3010 Taylor Springs Drive, Louisville, KY 40220. The Members, may, from time to time, change the registered agent or office through appropriate filings with the Secretary of State for the Commonwealth of Kentucky.

# ARTICLE II
# MEMBERS, MEMBERSHIP INTERESTS, CAPITALIZATION OF THE COMPANY

**Section 2.1 Names, Addresses and Capital Contributions**

The Members of the Company, their initial Capital Contributions to the Company, and their respective Percentage Interests in the Company shall be retained in the Company records alongside the Articles of Organization and Operating Agreement.

**Section 2.2 Form of Member Contributions**

No Member shall be required to make any Capital Contributions to the Company other than the Capital Contributions required to be made by such Member pursuant to the agreement to increase capital contributions pro rata by a majority of the votes held by the Members.

**Section 2.3 Loans or Services by Members**

Any loans from or services performed by any Member on behalf of the Company shall not be considered contributions to the capital of the Company. No Member shall be required to perform any services on behalf of the Company. Members shall be permitted to provide services on behalf of the Company and may receive compensation for those services upon the written agreement of a majority of votes held by the Members setting forth the compensation and the terms of compensation for those services.

**Section 2.4 Certificates of Membership Interest**

A Member's Percentage Interest in the Company shall be retained in the Company Records but shall be uncertificated.

**Section 2.5 Capital Accounts**

(a) No interest shall be paid on any Capital Contribution.

(b) A separate Capital Account shall be maintained for each Member in accordance with the applicable provisions of the Treasury Regulations:

(i) Each Members Capital Account shall be credited with such Member's Capital Contributions, such Member's distributive share of profits and any items in the nature of income or gain that are specially allocated pursuant to Article V hereof, and the amount of any Company liabilities that are assumed by such Member or that are secured by any Company property distributed to such Member.

(ii) Each Member's Capital Account shall be debited by the amount of cash distributed to such Member in accordance with the terms of this Operating Agreement, the gross asset value of any Company property distributed to such Member pursuant to any provisions of this Operating Agreement, such Member's distributive share of Losses allocated to such Member in accordance with this Operating Agreement, any items in the nature Of expenses of Losses that are specially allocated pursuant to Article V of this Operating Agreement and the amount of any liabilities of such Member that are assumed by this Company or that are assumed by this Company or that are secured by any property contributed by such Member to the Company.

(iii) In the event any Interest in this Company is transferred in accordance with the terms of this Operating Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Interest.

(iv) In the event the gross asset values of the Company assets are adjusted pursuant to this Operating Agreement or any amendments thereto, the Capital Accounts of all Members shall be adjusted concurrently in order to reflect the aggregate net adjustment as if this Company had recognized gain or loss equal to the amount of such aggregate net adjustment and the resulting gain or loss had been allocated among the members in accordance with the terms and provisions of the Operating Agreement.

(v) No Member shall have the right to withdraw his Capital Contribution or to demand and receive property of the Company or any distribution in return for his Capital Contribution, except as may be specifically provided in this Operating Agreement. No Member shall receive out of the Company property any part of his, her, or its Capital Contribution until (i) all liabilities of the Company have been paid, and (ii) the consent of all Members is first had and received.

(vi) Subject to the provisions of subsection (v) of this Section 2.5, a Member may rightfully demand the return of his or its Capital Contribution (i) upon the dissolution of the Company, or (ii) as may otherwise be provided in the Kentucky Limited Liability Company Act. A Member shall have only the right to demand and receive cash in return for the Member's Capital Contribution.

(vii) Except as is specifically provided otherwise in this Operating Agreement or in the Act, no Member shall have any obligation to restore a negative or deficit balance in such Member's Capital Account, nor shall such Member have any liability for failure to do so.

(c) As provided for in the Articles or Organization of the Company, upon the written consent of a majority of the Membership of the Company, and in order to obtain additional funds or for other lawful business purposes, additional capital may be contributed to the Company.

## ARTICLE III
## MANAGEMENT AND CONTROL OF COMPANY

**Section 3.1 Overall Management of Company Vested in Members**

Except as expressly provided otherwise in this Operating Agreement, management of the Company shall be vested in the Members of the Company who shall vote in proportion to their Percentage Interests in the Company as such may be adjusted from time to time pursuant to the terms and conditions set forth in this Operating Agreement.

**Section 3.2 Outside Activities; Member Qualification**

The Members or any of their Affiliates may engage in other activities of any nature. A Member need not be an individual, a resident of the Commonwealth of Kentucky, or a citizen of the United States.

**Section 3.3 Qualification to do Business in Kentucky**

If required by law, a Member of the Company shall be qualified to do business in Kentucky by obtaining appropriate authorization from the Secretary of State for the Commonwealth of Kentucky.

**Section 3.4 Member Meetings**

(i) Meetings of the Members may be called by Members representing in the aggregate more than fifty percent (50%) of the Percentage Interests in the Company.

(ii) The Company shall deliver or mail written notice of the Membership Meeting stating the (i)date; (ii) time; and (iii) place of the meeting and, when otherwise required by law, (iv) description of the purposes for which the meeting is called, to each Member of record, as such address as appears in the records and books of the Company. Said notice is to be mailed at least ten (10) but not more than thirty (30) days before the date and time of the meeting.

(iii) A Member may waive notice of a Member Meeting, before or after the date of the meeting, by delivering a signed waiver to the Company for inclusion in the books of the Company. A Member's attendance at any meeting, unless the Member at the beginning of the meeting objects to the holding of the meeting or transacting business at the meeting waives objection to consideration of a particular matter at the meeting that is not within any purposes described in the meeting notice, unless the Member objects to considering the matter when it is presented.

(iv) The record date for purposes of determining the Members who are entitled to notice of a Membership Meeting, for demanding a Membership or for voting at such Meeting, shall be the tenth (10th) day prior to the date of the Meeting.

(v) A Member may appoint a proxy to vote or otherwise act for the Member pursuant to a written appointment form executed by the Member or the Member' s duly authorized attorney-in-fact. An appointment of a proxy is effective when received by the Company. A proxy appointment is valid for twelve (12) months unless otherwise expressly stated in the appointment form.

(vi) At any Membership Meeting, each Member entitled to vote shall have a number of votes equal to the product of (i) his or her Percentage Interest multiplied by (ii) one hundred (100). At any Membership Meeting, the presence of Members entitled to cast at least fifty-one

percent (51%) of the total votes of all Members entitled to vote at such meeting shall constitute a quorum. Action on a matter is approved and passed if it receives approval by at least fifty-one percent (51%) of the total number of votes entitled to be cast by all Members in the Company entitled to vote at such meeting or such greater number as may be required by the Act or the Articles of Organization for the particular matter under consideration at the Membership Meeting.

(vii) Upon the occurrence of an event of disassociation (as defined in Article VI of this Agreement), a Former Member shall not be entitled to cast a vote concerning whether the Company shall purchase the interest of such Former Member as permitted in Article VI of this Agreement. Any assignee of a Member's Interest in the Company shall not be entitled to vote or participate on any matters at any Membership Meeting unless such assignee becomes a Substitute Member as provided for in Article VI of this Agreement.

(viii) Subject to subsection (ii) of this Section and the Act, any action required or permitted to be taken at a Membership Meeting may be taken without a meeting if the action is taken by all of the Members entitled to vote on the action. The action must be evidenced by one or more written consents describing the action to be taken, signed by all the Members entitled to vote on the action, and delivered to the Company for inclusion in the Company' s records. The record date for determining Members entitled to take action without a meeting is the first date a Member signs the consent to such action.

(ix) Any or all Members may participate in any Membership Meeting by, or through the use of, any means of communication by which all Members participating may simultaneously hear each other during the meeting. A Member so participating is deemed to be present in person at the meeting.

(x) At any Membership Meeting, the Members shall appoint a person to preside over the meeting and a person to act as secretary of the meeting. The secretary of the meeting shall prepare minutes of the meeting which shall be placed in the records of the Company.

(xi) Except as otherwise provided in this Operating Agreement or the Act, all powers of the Company shall be exercised by or under the authority oft and the business affairs of the company shall be managed under the direction of the Members.

**Section 3.5 Major Decisions; Drag-Along Sale.**

(a) No act shall be taken, sum expended, or obligation incurred by the Company except by the written consent of a majority of votes with respect to a matter within the scope of any of the major decisions enumerated below. The Major Decisions shall include:

(i) a mortgage or encumbrance upon all or substantially all assets of the Company;

(ii) any matter which could result in the amount or character of the Company's Contributions to capital;

(iii) a change in the character of the business of the Company;

(iv) disposal of the goodwill of the Company;

(v) submission of claim of the Company to arbitration;

(vi) confession of a judgment;

(vii) amendment of the Articles of Incorporation or Operating Agreement;

(viii) lending or borrowing money and issuing evidences of indebtedness;

(ix) to bring and defend actions in law or at equity; and

(x) to enter into any legal contracts

(xi) to carry out legal contracts;

(xii) to employ employees, agents, consultants, and advisors to act for the benefit an on behalf of the Company; and

(xiii) to buy, own, manage, sell, lease, mortgage, pledge or otherwise acquire or dispose of Company property; and

(xiv) the issuance of additional Interests or the admission of additional Members.

(b) Drag-Along Sale. If Emend Health Corporation (the "Dragging Member"), receives an offer to consummate, in one transaction or a series of related transactions, a sale of the Company membership interests owned by Walker Land Company VI, LLC (a "Drag-Along Sale"), the Dragging Member shall have the right to require that Walker Land Company VI, LLC (the "Drag-Along Member") to participate in the Drag-Along Sale and, within ten (10) days of receipt of notice of the Drag Along Sale, to vote in favor of and execute and deliver to the Dragging Member a written consent of the Company's Members to approve the Drag-Along Sale if it meets the requirements of Section 3.5(c) (a "Qualifying Drag-Along Sale").

(c) Requirements of a Qualifying Drag-Along Sale. Any Drag-Along Sale that results in at least two million eight hundred thousand dollars ($2,800,000.00) payable as follows to the following parties and the Drag-Along Member shall constitute a Qualifying Drag-Along Sale described in Section 3.5(b):

(i) $755,715.19 (plus any interest, fees, costs, charges, service charges and/or penalties accrued thereon or incurred at the time of payment and less any payments made, if any) paid to W Principles, LLC to secure release of a Mechanic's and/or Materialman's Lien filed on or about November 10, 2025;

(ii) $2,000,000 (plus any interest, fees, costs, charges, service charges and/or penalties accrued thereon or incurred at the time of payment and less any payments made, if any) paid to Arthur E. Walker III to secure release of a Commercial Mortgage and Assignment of Leases and Rents filed on or about January 29, 2025; and

(iii) the remaining balance of the Purchase Price paid to Walker Land Company VI, LLC.

(d) Except for a Qualifying Drag-Along Sale (the approval of which shall be governed by Section 3.5(c) and (d)), the sale of the Property or all or substantially all assets of the Company shall require the consent of Members holding a Majority Interest.

**Section 3.6 Reimbursement of Members**

A Member of the Company shall be entitled to reimbursement from the Company of all expenses of the Company reasonably incurred and paid by such Member on behalf of the Company.

**Section 3.7 Expenses of Organization**

The Company shall pay all expenses incurred in the organization of the Company.

**Section 3.8 Limitation of Liability**

Each Member's Liability for debts and obligations of the Company shall be limited as set forth in the Kentucky Limited Liability Act Section 275.150, and other applicable law.

**Section 3.9 List of Members**

Upon written request of any Member, the Company shall provide a list showing the names, last known addresses, and Percentage Interest of all Members in the Company.

**Section 3.10 Company Books and Records**

The Company shall maintain and preserve at the Company's principal office, during the term of the Company, and for three (3) years thereafter, the following records:

(i) a current list, and all past lists, setting forth the full name and last known mailing address of each Company member;

(ii) all accounts, books, and other relevant Company documents, including, but not limited to, a copy of the Articles of Organization together with any supplements, modifications , or amendments thereto, and any executed copies of any power of attorney pursuant to which any Articles of Amendment have been executed;

(iii) any prior operating agreements no longer in effect, written agreements by a Member to make a Capital Contribution to the Company; and

(iv) copies of the Company's federal, state, and local income tax returns and all financial statements for the three (3) most recent years.

Upon reasonable request, each Member shall have the right, during ordinary business hours, to inspect and copy such Company documents at the Member's expense.

**Section 3.11 Return of Capital**

No member shall have priority over any other Member, either as to the return of Capital Contributions or as to profits, losses, or distributions. This Section 3.11 shall not apply to loans which a Member has made to the Company.

## ARTICLE IV
## ACCOUNTING AND RECORDS OF THE COMPANY

**Section 4.1** **Records and Accounting**

The Company shall maintain at its principal office separate books of account for the Company which shall show a true and accurate record of all costs and expenses incurred, all charged made, all credits made and received, and all income derived in connection with the accounting in preparation of its annual reports and for tax purposes shall keep its books accordingly. The fiscal year of the Company for financial reporting and for federal income tax purposes shall be the calendar year.

**Section 4.2** **Access to Accounting Records**

All books and records of the Company shall be maintained at any office of the Company or at the Company's principal place of business, and each Member, and his duly authorized representative, shall have access to them as such office of the Company and have the right to inspect and copy them during business hours and at the inspecting Member's own expense.

**Section 4.3** **Annual and Tax Information**

The Company shall use its best efforts to cause the Company to deliver to each Member within sixty (60) days after the end of each fiscal year all information necessary for the preparation of each Member's individual federal income tax return. Within ninety (90) days after the end of each fiscal year, the Company shall provide each Member with a copy of the balance sheet of the Company as of the last day of such fiscal year, a statement of the Company's cash flow for such fiscal year, a statement of income or loss for the Company for such fiscal year, and a statement of the Member's Capital Account and changes therein for such fiscal year. Such statements shall be reviewed by the Company's accountants.

**Section 4.4** **Accounting Decisions**

All decisions as to accounting matters, except as otherwise specifically set forth herein, shall be made by the Members. The Members may rely upon the advice of their accountants or upon other qualified persons as to whether such decisions are in accordance with the accounting methods followed for federal income tax purposes.

**Section 4.5** **Federal Income Tax Elections**

In case of a transfer of all or part of the Interest of a Member, the Company may elect pursuant to Section 734, 743, and 754 of the Code as amended (or corresponding provisions of future law) to adjust the basis of the assets of the Company, but only by the written consent of a Majority Interest of the Company.

## ARTICLE V
## ALLOCATIONS AND DISTRIBUTIONS

**Section 5.1 Allocation**

Except as may be expressly provided otherwise in this Operating Agreement, and subject to the provisions of Section 704 (c) of the Code, the net income, net loss, or capital gains of the Company for each fiscal year of the Company shall be allocated to the Members, pro rata in accordance with their Percentage Interest. Net profits shall be allocated based on services provided by providers and clinicians employed by each Member, respectively.

**Section 5.2 Distribution of Available Cash**

Periodically, the Available Cash of the Company, if any, may be distributed to the Members, pro rata in accordance with their Percentage Interest. For any period, Available Cash of the Company need not be distributed to the extent that such cash is required for a reasonable working capital reserve for the Company, the amount of such reasonable working capital reserve to be determined by the Members. A majority interest shall be required to make a determination to distribute available cash

**Section 5.3 Distributions; Transferred Interests**

Distributions of Company assets in respect of an Interest in the company shall be made only to the Members who, according to the records of the Company, are the holders of record of the Interests in respect of which such distributions are made on the actual date of distribution. Neither the Company nor any Member shall incur any liability for making distributions in accordance with the provisions of the preceding sentence, whether or not the Company or the Member had either actual or constructive knowledge or notice of any transfer or purported transfer of ownership on the Interest in the Company which has not been approved by a vote of Majority Interest in the Company. Notwithstanding any provision above to the contrary, any gain or loss of the Company realized in connection with a sale or other disposition of any of the assets of the Company shall be allocated solely to the parties owning Interests in the Company as of the date such sale or other disposition occurred.

**Section 5.4 Limitation Upon Distributions**

No distribution shall be declared and paid unless, after the distribution is made, the assets of the Company are in excess of all liabilities of the Company, except liabilities to Members on account of their contributions.

**Section 5.5 Acknowledgment**

The Members are aware of the income tax consequences of the allocations made by this Article V hereof and agree to be bound by the provisions of this Operating Agreement in reporting their share of Company income and loss for income tax purposes.

## ARTICLE VI
## EVENTS OF DISASSOCIATION; CONTINUATION OF BUSINESS; TRANSFER OF MEMBERSHIP INTEREST

**Section 6.1 Events of Disassociation**

(a) Events of Disassociation and Continuation of the Company: The death, retirement, resignation, withdrawal, expulsion, bankruptcy, or dissolution of a Member, or the occurrence of any other event which terminates the continued membership of a Member in the Company (Event of Disassociation) shall not dissolve the Company unless the remaining Member(s) unanimously consent in writing to the dissolution of the business of the Company.

(b) Purchase of Former Member's Interest: If the Member whose actions or conduct result in the Event of Disassociation ("Former Member") rightfully demands the return of its Interest by a written notice to the remaining Member(s), the Company (if the remaining Member(s) unanimously consent in writing) or remaining Member(s), to avoid dissolution of Company, shall within six (6) months following such written notice, purchase the Former Member' s Interest as provided in this Article VI .

**Section 6.2 Transfer and Assignment of Membership Interests**

No Member shall be entitled to assign, convey, sell, encumber or in any way alienate all or any part of their Interest in the Company without the prior written consent of a majority interest of all other Members. Such prior written consent may be given or withheld, conditioned or delayed as allowed by this Operating Agreement or the Act.

**Section 6.3 Substitute Members**

A transferee of a Member's Interest in the Company shall have the right to become a substitute Member upon:

(i) the written consent of the majority interest of all non-transferring Members;

(ii) the execution by the transferee of a document satisfactory to the remaining Members accepting and adopting the terms, provisions and obligations of this Operating Agreement and

(iii) payment of such transferee of all reasonable expenses in connection with his, her, or its admission as a Substitute Member.

## ARTICLE VII
## INDEMNIFICATION

**Section 7.1 Right to Indemnification**

Each Member or Organizer (including the heirs, executors, administrators, and estate of each person) shall be indemnified by the Company as of right to the fullest extent permitted or authorized by the Act or future legislation or by current or future judicial or administrative decision, again all fines, liabilities, settlements, losses, damages, costs and expenses, including attorney's fees, asserted against him or incurred by him in his capacity as a Member or Organizer.

The foregoing right of indemnification shall not be exclusive of other rights to which those seeking indemnification may be entitled. The Company may maintain insurance, at its expense, to protect

itself and the indemnified persons against all fines, liabilities, costs and expenses, including attorney's fees.

**Section 7.2 Advances**

All costs, charges, and expenses (including reasonable attorney's fees) incurred by a Member or Organizer as referred to in Section 7.1 of this Article VII in defending a civil or criminal action or proceeding shall be paid by the Company in advance of the final determination thereof. The Company's receipt of an undertaking by the Member or Organizer to repay all amounts advanced if it is ultimately determined that the Member or Organizer is not entitled to be indemnified by the Company as authorized by this Article VII must first be had and received prior to any advance payment of costs and expenses by the Company.

## ARTICLE VIII
## DISSOLUTION, TERMINATION, AND WINDING UP OF THE COMPANY

**Section 8.1 Events Causing Dissolution**

The Company shall be dissolved upon the happening of the first to occur of the following:

(i) The expiration of the term set forth in the Articles of Organization of the Company;

(ii) Any order of a court of competent jurisdiction requiring dissolution;

(iii) The filing of a certificate of dissolution by the Secretary of State;

(iv) The written consent of a Majority Interest of the Company to dissolve the Company;

(v) A merger or exchange in which the Company is not the surviving or acquiring company.

**Section 8.2 Continued Existence for Purposes of Winding Up**

The Company shall continue to exist after the happening of any of the events set forth in Section 8.1 of this Article solely for the purpose of winding up its affairs in accordance with the Act.

**Section 8.3 Procedure Upon Liquidation**

Unless the business of the Company is continued pursuant to the provisions of Section 8.2 of this Operating Agreement, upon the dissolution of the Company, the Members shall liquidate the assets of the Company and apply the proceeds of liquidation in the order of priority provided in Section 8.4 of this Article VIII.

A reasonable time shall be allowed for the orderly liquidation of the Company assets and the discharge of Company liabilities in order to minimize losses that might otherwise occur in connection with the liquidation. Upon liquidation and winding up of the Company, unsold Company property shall be valued to determine the gain or loss that would have resulted if the property were

sold, and the Capital Accounts of the Members that have been maintained in accordance with this Operating Agreement shall be adjusted to reflect the manner in which the gain or loss would have been allocated to the Members if the property had been sold at its assigned values. Upon completion of the liquidation of the Company and distribution of the proceeds, the Company shall cause to be filed articles of dissolution with the Secretary of State's Office in and for the Commonwealth of Kentucky.

**Section 8.4 Proceeds of Liquidation**

Before the later to occur of (i) the close of the Company's taxable year, or (ii) ninety (90) days following the date of Company dissolution, all proceeds from the liquidation of assets of the Company, the proceeds from the collection of the Company's accounts receivable, and the assets distrusted in kind shall all be distributed in the following order of priority:

(i) first, to payment and discharge of all debts and liabilities of the Company which are then properly due and owing (other than to Members) and to the necessary expenses of liquidation;

(ii) second, to the settling of reserves in order to disburse the reserves in payment of contingent liabilities or obligations of the Company, and, at the expiration of the reserve period, the balance of the reserves, if any, shall be distributed as liquidating proceeds received at the end of the reserve period; and

(iii) third, to the Members in proportion to and to the extent of the balances of their Capital Accounts.

All distributions pursuant to clause (c) shall be made no later than the end of the Company's fiscal year during which the liquidation of the Company occurs or within ninety (90) days after the date of the liquidation, whichever is later. No Member shall be required to contribute any property to the Company or any third party by reason of having a negative Capital Account.

## ARTICLE IX
## MISCELLANEOUS PROVISIONS

**Section 9.1 Complete Agreement**

This Operating Agreement and the Articles of Organization of the Company constitute the complete and exclusive statement of agreement among the Members with respect to the subject matter hereof. This Operating Agreement and the Articles of Organization supersede all prior written and oral statements and no representation, statement, or condition or warranty not contained in this Operating Agreement or the Articles of Organization shall be binding on the Members or have any force or effect whatsoever.

**Section 9.2 Governing Law**

This Agreement and the rights of the parties hereunder will be governed by, interpreted, and enforced in accordance with the laws of the Commonwealth of Kentucky.

**Section 9.3 Terms**

Common nouns and pronouns will be deemed to refer to the masculine, feminine, neutral, singular, and plural, as the identity of the person or persons, firm, or corporation may in the context require. Any reference to the Code or other statutes or laws will include all provisions concerned.

**Section 9.4 Headings**

All headings herein are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Operating Agreement.

**Section 9.5 Severability**

Every provision of this Operating Agreement is intended to be severable. If any term or provisions is illegal or invalid for any reason whatsoever, the illegality or invalidity shall not affect the validity of the remainder of this Operating Agreement.

**Section 9.6 Amendments**

The Members of the Company may amend this Operating Agreement only by the written approval of a majority of the voting interests, equivalent to the Percentage Interests, of all of the Members.

**Section 9.7 Heirs, Successors and Assigns**

Each and all of the covenants, terms, provisions, and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Agreement, their respective heirs, legal representatives, successors, and assigns.

**Section 9.8 Notices**

Any notice, demand, or communication required or permitted to be given by any provision of this Operating Agreement shall be deemed to have been sufficiently given or served for all purposes if delivered personally to the party or to any executive officer of the party to whom the same is directed or, if sent by registered or certified mail, postage and charges prepaid, addressed to the Member's and/or Company's address, as appropriate, which is set forth in this Operating Agreement. Except as otherwise provided herein, any such notice shall be deemed to be given three (3) business days after the date on which the same was deposited in a regularly maintained receptacle for the deposit of United States Mail, addressed and sent as aforesaid.

**Section 9.9 Execution of Additional Instruments**

Each Member hereby agrees to execute such other further statements of Interest and holdings, designations, powers of attorney and other instruments necessary to comply with any laws, rules, or regulations.

**Section 9.10 Waiver**

The failure of any party to seek redress for violation of or to insist upon the strict performance of any covenant or condition of this Operating Agreement shall not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

**Section 9.11 Rights and Remedies Cumulative**

The rights and remedies provided by this Operating Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive the right to use any or all other remedies. Said rights and remedies are given in addition to any other rights the parties may have by law, statute, ordinance, or otherwise.

**Section 9.12 Creditors**

None of the provisions of this Operating Agreement shall be for the benefit of or enforceable by any creditors of the Company.

**Section 9.13 Counterpart Execution**

This Operating Agreement may be executed in any number of counterparts with the same effect as if all parties had signed the same document. All counterparts shall be construed together and shall constitute one Agreement.

**Section 9.14 Amendment and Restatement of Operating Agreement**

This Operating Agreement amends, restates and supersedes the Prior Agreement and all other prior Company operating agreements.

**SIGNATURES ON FOLLOWING PAGE**

The undersigned hereby execute the above Amended and Restated Operating Agreement of Bellefonte Properties, LLC, effective upon the date first set forth above.

EMEND HEALTH CORPORATION

By:____________________

Name: Christopher A. Wilson

Title: Director

WALKER LAND COMPANY VI, LLC

By:____________________

Name: Arthur E. Walker III

Title: Member/Manager

**BELLEFONTE PROPERTIES, LLC**
**A KENTUCKY LIMITED LIABILITY COMPANY**

Pursuant to Section 2.1 of the Amended and Restated Operating Agreement made and entered into as of the 27th day of January, 2026, below is a true and complete listing of the names, capital contributions, and respective percentage interests of each of the initial members of the Company.

| NAME | CAPITAL CONTRIBUTION | RESPECTIVE PERCENTAGE INTEREST |
|---|---|---|
| Emend Health Corporation | $10,000 | 50% |
| Walker Land Company VI, LLC | $10,000 | 50% |

# Bellefonte Properties LLC Operating Agreement__5

Final Audit Report 2026-01-31

| | |
|---|---|
| Created: | 2026-01-31 |
| By: | Christopher Wilson (chris.wilson@emendhealthcare.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAkZ66XRFb8I-6cy3OvMfQaU5BBNnzv-d6 |

## "Bellefonte Properties LLC Operating Agreement__5" History

Document created by Christopher Wilson (chris.wilson@emendhealthcare.com)
2026-01-31 - 8:05:51 PM GMT

Document emailed to awalkeriii@wprinciples.com for signature
2026-01-31 - 8:05:57 PM GMT

Document emailed to Christopher Wilson (chris.wilson@emendhealthcare.com) for signature
2026-01-31 - 8:05:57 PM GMT

Document e-signed by Christopher Wilson (chris.wilson@emendhealthcare.com)
Signature Date: 2026-01-31 - 8:06:13 PM GMT - Time Source: server

Email viewed by awalkeriii@wprinciples.com
2026-01-31 - 10:48:12 PM GMT

Signer awalkeriii@wprinciples.com entered name at signing as Arthur E. Walker III
2026-01-31 - 10:49:19 PM GMT

Document e-signed by Arthur E. Walker III (awalkeriii@wprinciples.com)
Signature Date: 2026-01-31 - 10:49:21 PM GMT - Time Source: server

Agreement completed.
2026-01-31 - 10:49:21 PM GMT